UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

UNITED STATES OF AMERICA,

Dkt. No. 17-CR-610

v.

JUSTIN COOPER,

Defendant.

-----------------------------------------------------X

**SENTENCING MEMORANDUM**

Edward V. Sapone, Esq.
Chase S. Ruddy, Esq.
Sapone & Petrillo, LLP
*Attorneys for Defendant*
*Justin Cooper*
One Penn Plaza, Suite 5315
New York, New York 10119
Telephone: (212) 349-9000
E-mail: edward@saponelaw.com

## <u>TABLE OF CONTENTS</u>

**Page**

I.      Introduction ...................................................................................................................1

II.     History & Characteristics of Mr. Cooper and the Nature &
        Circumstances of the Offense (§3553(a)(1)) ...........................................................3

       *a.*      *Mr. Cooper's History & Characteristics* ...........................................................3

       *b.*      *Nature and Circumstances of the Offense* ........................................................11

III.    Remaining Factors of 18 U.S.C. §3553(a) .............................................................12

       *a.*      *The Need for the Sentence Imposed to Reflect the Seriousness*
        *of the Offense, to Promote Respect for the Law, to Provide*
        *Just Punishment for the Offense, and to Avoid Unwarranted*
        *Sentence Disparities* ........................................................................................12

       *b.*      *The Requested Sentence Can Provide Adequate*
        *Deterrence, and Protect the Public from Future*
        *Offenses by Mr. Cooper* ...................................................................................15

IV.     Conclusion ...................................................................................................................18

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Gall v. United States*,
    552 U.S. 38 (2007)................................................................................16

*Griffin v. Wisconsin*,
    483 U.S. 868, 874 (1987).....................................................................16

*United States v. Bannister*,
    786 F. Supp. 2d 617 (E.D.N.Y. 2011) .......................................5,6,7, 12

*United States v. Knights*,
    534 U.S. 112, 119 (2001).....................................................................16

*United States v. Nesbeth*,
    (E.D.N.Y., 15-CR-018 (FB)) ...............................................................13

**Statutes**

18 U.S.C. §3553(a) ....................................................................... *passim*

21 U.S.C. §841(b)(1)(C) .....................................................................1

21 U.S.C. §846......................................................................................1

**Other Authorities**

Andrew von Hirsch, Anthony Bottoms, Elizabeth Burney, and P-O. Wikstrom,
    "Criminal Deterrence and Sentence Severity: An Analysis of Recent Research,"
    Oxford: Hart Publishing (1999) .............................................................16

Bruce D. Johnson, et al., *Crack Distribution and Abuse in New York,* 11 Crime Prevention
    Stud. 19 (2000)....................................................................................9

Elijah Anderson, *Code of the Street: Decency, Violence, and the Moral Life of the Inner
    City* (2000) .....................................................................................8, 9

Kenneth W. Griffin, et al., *Parenting Practices as Predictions of Substance Use, Delinquency,
    and Aggression Among Urban Minority Youth: Moderating Effects of Family Structure and
    Gender*, 14 Psych. Of Addictive Beh. 174, 174 (2000)...........................8

Michael C. Lu, et al., *Where is the F in MCH? Father Involvement in African American Families*, 20 Ethnicity & Disease S2-49 (2010) .......................................................................8

Michael Pinard, *Collateral Consequences of Criminal Convictions: Confronting Issues of Race and Dignity*, 85 N.Y.U. L. Rev. 457 (2010) ............................................................................13

Michelle Alexander, *The New Jim Crow* 142 (2010) .................................................................13

Philip J. Cook & Jens Ludwig, *The Economist's Guide to Crime Busting*, Wilson Q. (Winter 2011) ...........................................................................................................9

Shawn D. Bushway & Peter Reuter, *Deterrence, Economics, and the Context of Drug Markets*, 10 Criminology & Pub. Pol'y 183 (2011) ..............................................................................12

*The Kerner Report: The 1968 Report of the National Advisory Commission on Civil Disorders* 267 (Pantheon 1988) (1968) ..............................................................................................8

United States Sentencing Commission Sourcebook of Federal Sentencing Statistics for Fiscal Year 2018 .................................................................................................13

Valerie Wright, Ph.D., *Deterrence in Criminal Justice: Evaluating Certainty v. Severity of Punishment*, The Sentencing Project (November 2010) *available at* http://www.sentencingproject.org/doc/Deterrence% 20Briefing% 20.pdf..............................16

William Julius Wilson, *When Work Disappears: The World of the New Urban Poor* (1996) .............................................................................................6

## I.      Introduction

Defendant Justin Cooper is scheduled for sentencing on June 4, 2019, at 11:15 a.m.  I offer this memorandum to assist the Court to arrive at the appropriate sentence.

At the outset, we want the Court to know that Mr. Cooper recognizes how serious his offense is and that he has no one to blame but himself. He formally accepted responsibility on November 21, 2018, to count two of the indictment (17-CR-610), charging him with Conspiracy to Distribute and Possess with Intent to Distribute  Crack Cocaine, in violation of 21 U.S.C. §§ 846 & 841(b)(1)(C).

The Government, Probation and I agree that the Court should begin its sentencing analysis at an advisory sentencing range of 18 to 24 months of imprisonment. We respectfully suggest, however, that an incarceratory sentence would be greater than necessary to achieve the objectives of sentencing. Instead, considering the factors of 18 U.S.C. §3553(a), we believe that a sentence of time served with three years' supervised release and community service is sufficient.

Mr. Cooper has learned a very difficult and valuable lesson. He is riddled with regret over his actions and desires only to continue to support his two young daughters. As the Court considers the whole person whom it will sentence, we submit that Mr. Cooper's history and characteristics (18 U.S.C. §3553(a)(1)) warrant leniency, and that the requested sentence can adequately balance the goals of sentencing with the unique facts and circumstances of Mr. Cooper's life.

We wish to highlight in this memorandum the following:

(1) **Positive Work History** – Mr. Cooper, despite failing to finish the 10th grade, has a strong work history. From 2007 to 2016, Mr. Cooper worked as a laborer for Kenny Long Productions and performing landscaping work at Mr. Long's home. He further

supplemented this with stints working for a boiler installation business and babysitting for younger family members;

(2) **Father of Two** – Mr. Cooper is a father to two young children: J█████ C█████ (7), and Z██ C████ (1), who depend on him. During his period of home detention while on pretrial release, Mr. Cooper has operated as a stay-at-home dad to Z██, and is her primary caretaker.

(3) **No Risk of Recidivism** – Mr. Cooper is 31 years of age. His only prior arrest and conviction stems from a misdemeanor New York State assault case eight years ago. Despite the conditions in which he grew up in New York City Public Housing, despite not having graduated high school, and being surrounded by illegality for most of his life, including within his own family, Mr. Cooper is a relative success story. He has lived a largely law-abiding life. Now he cares for his young daughter and is intent on continuing his positive work history. During his pretrial release, he obtained his OSHA certification and received training and certification in custodial maintenance which he hopes to use to secure future employment;

(4) **Need to Avoid Disparity –** Mr. Cooper is no more culpable than co-defendant Jeffrey Goodridge, who received a sentence of time served and three years' post released supervision from the Court on March 7, 2019. Mr. Cooper's participation in the conspiracy was short lived and relatively minor. The evidence against him comes from one sale to a confidential informant, and three telephone calls between Mr. Cooper's cellular phone and a phone belonging to co-defendant Patrick Innis. He is held accountable for the same quantity of crack cocaine as Mr. Goodridge, and is arguably less culpable than Mr. Goodridge, who is held responsible for at least three separate sales to an informant over a three month period; and

(5) **Environment** – Mr. Cooper grew up in environments in the Edenwald and Mill Brook housing projects where, without a father or any meaningful male role model, and surrounded by poverty, he had a difficult life. Nonetheless, he has learned a valuable lesson and is intent upon being a positive role model to his two children.

As discussed in greater detail below, the factors of 18 U.S.C. §3553(a) and the objectives of the parsimony clause demonstrate that the requested sentence meets the ends of justice.

## II.   History & Characteristics of Mr. Cooper and the Nature & Circumstances of the Offense (§ 3553(a)(1))

*a.   Mr. Cooper's History & Characteristics*

Mr. Cooper is 31 years of age. He grew up in the Bronx, New York, where he was raised by a single mother. To this day, Mr. Cooper does not know the identity of his father.

Mr. Cooper has spent virtually his entire life living in public housing. He grew up in the Edenwald Projects of the East Bronx, and from the age of 15 to 30 he lived with his mother in the Mill Brook Houses in the South Bronx. His mother worked "on and off" performing maintenance work in the housing complexes, but Mr. Cooper and his six half-siblings predominantly relied on public assistance benefits and food stamps.

Although his mother did her best to raise Mr. Cooper, the absence of his father, or any significant male role model, weighed heavily on him during his formative years. He felt hurt, angry, unloved and unworthy. He also struggled with learning disabilities and was placed in special education. He dealt with the frustration he faced in school and at home by acting out, and was labeled a "class clown." Really, Mr. Cooper was just struggling to find his place in the world.

Sadly, he never got the help or the attention that he needed. While he met with a school counselor for a year when he was 15, they treated him more as a problem child than someone in need of help and extra attention. The result is that Mr. Cooper eventually lost interest in school and dropped out without completing the 10th grade.

Despite failing to finish school, Mr. Cooper got a job working with Kenny Long Productions setting up stages and sets for events and productions. For seven years he worked for the company full-time as a laborer. In 2008, he supplemented his income at Kenny Long by working as a babysitter for three of his younger family members, for which he was paid by the

Human Resources Administration. Then, in 2010, he worked for a brief time with a cousin installing boilers. Thereafter, for six years, he worked performing landscaping for Kenny Long, the owner of the production company, at his home in Rhinebeck New York.

When Mr. Cooper was 22 years of age he met Destiny Felder, three years' his elder, who lived in the same neighborhood and they began dating. They maintained a relationship on and off for five years, during which Ms. Felder gave birth to Mr. Cooper's first daughter, J██████.

While Mr. Cooper was excited at the prospect of fatherhood, and was a good father to J██████, his relationship with Ms. Felder eventually ran its course. He continued to see J██████ and to provide for her financially until his arrest in this case and unemployment caused him to fall behind on his child support obligations. Mr. Cooper still talks to J██████ frequently on the telephone, and sees her when her mother's schedule permits.

Then, in 2013, Mr. Cooper met China Martin. They have been in a committed relationship since then, and together have a 16-month-old daughter, Z████. Ms. Martin is a pre-kindergarten teacher with the New York City Board of Education, and Mr. Cooper has handled all of the childcare responsibilities as a stay-at-home dad during his period of home detention while this case has been pending.

While Mr. Cooper has little education, and few marketable skills, he is interested in rejoining the workforce. To that end, during his home confinement he completed a 30-Hour OSHA certification  (*see* Exhibit A) and has obtained training and certification in custodial maintenance. He has submitted applications to Chefs Warehouse, Madison Square Garden, Procida Construction Corp. and New York City Business Solutions, and is working with Workforce 1 career center in Jamaica, New York to find other employment opportunities. (*See* Exhibit B).

Respectfully, Mr. Cooper is different from the stereotypical defendant in these cases who spends much of his young adulthood stuck in a repeating cycle of criminality and imprisonment. As mentioned above, but for single misdemeanor assault conviction eight years ago, this is Mr. Cooper's first contact with the law; he has caused no trouble while on home confinement; he has taken care of his infant daughter; and he is intent upon working and supporting his young family. All he needs is a second chance.

While there is absolutely no excuse for engaging in this kind of activity, or any criminal activity for that matter, we wish to shed some additional light on how an otherwise hard-working, caring young man winds up in this position.

Never as an excuse, but instead offered by way of unfortunate explanation, experience has shown that all too often young men who grow up in high crime neighborhoods of the inner city without a positive male role model, without necessary educational resources, and saddled with emotional baggage, make poor decisions and wind up as part of a sad statistic in the criminal justice system.

In *United States v. Bannister*, 786 F.Supp.2d 617 (E.D.N.Y. 2011), United States District Judge Jack B. Weinstein engaged in a thorough analysis of these underlying systemic issues, and how, all too often, the limited options available to young black men like Mr. Cooper lead them to engage in criminal activity, which is often occurring right outside their door.

And while Mr. Cooper comes before the Court because of choices he made, and for which he accepts full responsibility, Judge Weinstein makes a number of observations that can be applied to Mr. Cooper and the limited options available to him, in part due to the "fixed artifacts of history." *Id*. at 624.

In *Bannister*, the defendants were part of a drug crew operating in the Louis Armstrong housing projects in Bedford Stuyvesant Brooklyn, a backdrop eerily similar to the Mill Brook Houses of the South Bronx.

It's no secret that persistent *de facto* racial segregation remains a fundamental aspect of life for low-income African Americans, a great many of whom still live in highly segregated communities. *See id*. at 636. Like Bed-Stuy, Eastchester, where Mr. Cooper spent the first 14 years of his life, is a well-known predominantly minority neighborhood. As of the 2016 census, Bronx Community District 12, which comprises Eastchester, was 70% African American, 18% Hispanic, and 5% white. (*See* Exhibit C). The percentage of residents living below the poverty line in Bronx Community District 12 is 20% higher than the rate in New York, and 25% higher than the rate across the United States. (*See* Exhibit C).

The South Bronx, where Mr. Cooper moved to the Mill Brook houses at age 15, is no different. As of the 2010 census, Bronx Community District 1, which comprises the South Bronx, was 28% African American, 67% Hispanic, and 3% white.  (*See* Exhibit D).  To a significant degree, this lack of integration results from the segregated conditions of public housing. *See Bannister*, 786 F.Supp.2d at 636, citing William Julius Wilson, *When Work Disappears: The World of the New Urban Poor* at 48 (1996) ("[P]ublic housing … has isolated families by race and class for decades, and has therefore contributed to the growing concentration of jobless families in the inner-city ghettos in recent years."). The percentage of residents living below the poverty line in Bronx Community District 1 is 44.2%, which is more than three times higher than the rate in New York (14.1%) and the rate across the United States (13.1%). (*See* Exhibit D). The number of children under 18 living below the poverty line is an astounding 59%. (*See* Exhibit D).

The cycle of poverty begins at birth for many of the South Bronx's residents. And things don't get much better for many. Educational attainment in the South Bronx is well behind the rest of New York and the nation. 41% of individuals 25 years of age and older haven't finished high school. (*See* Exhibit D). Less than one in three has attended any college courses, and less than 10% has a college degree.

This low rate of educational attainment contributes to a cycle of poverty and unemployment. The median household income of the South Bronx is $20,966 per year. (*See* Exhibit D). This is approximately one third of the median NYC household income--$64,894--and the median household income across the United states--$60,336. (*See* Exhibit D). According to a 2015 Community Health Profile of Mott Haven and Melrose, where the Mill Brook Houses are located, one in six adults ages 16 and older is unemployed. (*See* Exhibit E). The high unemployment rate and lack of well-paying jobs directly contributes to every other economic and social problem in the South Bronx.

Even more specifically, in the Mill Brook Houses, only 42% of households derive their income from employment, while roughly 2/3 of households depend on social security, SSI disability, or other forms of public assistance. (*See* Exhibit F). The cost of joblessness is not merely economic. It's psychological and sociological effects are devastating. *See Bannister*, 786 F.Supp.2d at 624.

These psychological and sociological effects are compounded for young men, by the absence oftentimes of any positive male role models in their lives. The absence of fathers and the prevalence of single-female-headed families gravely impairs the ability of children, particularly boys, to internalize positive values as they mature. "Young men who lack … [an] effective father figure, both as a role model and as a viable presence in their lives, are often hard-pressed to

organize their lives in accordance with his standards, standards handed down from generation to generation[.]"Elijah Anderson, *Code of the Street: Decency, Violence, and the Moral Life of the Inner City* at 237 (2000); *see also* Michael C. Lu, et al., *Where is the F in MCH? Father Involvement in African American Families*, 20 Ethnicity & Disease S2-49 (2010)("[C]hildren growing up in father-absent families are at greater risk for various educational or behavioral problems and poorer developmental outcomes, even after controlling for parental education, income and other factors."); Kenneth W. Griffin, et al., *Parenting Practices as Predictions of Substance Use, Delinquency, and Aggression Among Urban Minority Youth: Moderating Effects of Family Structure and Gender*, 14 Psych. Of Addictive Beh. 174, 174 (2000)("[R]esearch has shown that youth from single-parent families often have higher rates of problem behaviors including substance use, aggression, school dropout, and teenage pregnancy.").

Taking it one step further, the lack of male parental guidance for young men like Mr. Cooper is a known, significant contributor to crime. And while many fatherless children experience positive childhoods, many do not:

> With the father absent and the mother working, many [...] children spend the bulk of their time on the streets ... of a crime-ridden, violence-prone and poverty-stricken world. The image of success in this world is not that of the "solid citizen," the responsible husband and father, but rather that of the "hustler" who promotes his own interests by exploiting others. The dope sellers ... are the "successful" men because their earnings far outstrip those [of] men who try to climb the economic ladder in honest ways.
>
> Young people in the ghetto are acutely conscious of a system which appears to offer rewards to those who illegally exploit others, and failure to those who struggle under traditional responsibilities. Under these circumstances, many adopt exploitation and the "hustle" as a way of life....

*The Kerner Report: The 1968 Report of the National Advisory Commission on Civil Disorders* at 262 (Pantheon 1988) (1968).

Of the 52,846 households in Bronx Community District 1, 48% of those households are female-headed single parent households. (*See* Exhibit D).  45% of all households in the Mill Brook Houses are single-parent households, compared to just 6% two-parent households. (*See* Exhibit F).

For many boys, the cumulative result of poverty, racial segregation, antisocial ethics, and fatherlessness is often crime. The lure of reliable, easy income through the sale of drugs is particularly appealing to many young people living in poverty. *See* Bruce D. Johnson, et al., *Crack Distribution and Abuse in New York,* 11 Crime Prevention Stud. 19, 41 (2000). "For many impoverished young black men of the inner city, the opportunity for dealing drugs is literally just outside the door." Anderson, *supra,* at 114.

The saga of deprivation, isolation and crime that characterize life in neighborhoods like the Louis Armstrong Houses or the Mill Brook Houses is relevant to sentencing, and why particular defendants make the poor decisions to engage in criminal activity. *See* Philip J. Cook & Jens Ludwig, *The Economist's Guide to Crime Busting*, Wilson Q., Winter 2011, at 62 ("Most of us choose to abstain from crime in part because we have a lot to lose if we get caught…. The calculus for an unemployed dropout with readily available criminal options and few licit prospects is likely to be quite different.").

None of this is offered to excuse the commission of crime. Nonetheless, these statistics underscore staggering social and familial problems that help to explain important details of Mr. Cooper's life that offer mitigation at sentencing. As described above, he grew up in an environment of *de facto* racial segregation characterized by unemployment, poverty, and illegality. He lacked a male role model, and suffered from inadequate educational resources and tools for success.

In an environment where his employment prospects were already meager, he dropped out of high school without any discernible skills. Nonetheless, for many years, Mr. Cooper remained gainfully employed and resisted the negative influences in his neighborhood.

It was not until 2017, when Mr. Cooper was unemployed, with the added weight of a second child on the way, and mounting child support, that he succumbed to participating in the instant conspiracy. Sadly, his poor decision was made easier because his brother Matthew Cooper, and his cousin Jeffrey Goodridge, were already involved at the time of Mr. Cooper's participation.

In spite of the difficult circumstances under which Mr. Cooper grew up, and the poor decisions he made participating in the instant conspiracy, he is at heart a good and caring man. The letters written to the Court describe him as a "good person" and "a hardworking family man." (*See* Exhibits G & H).

Mr. Cooper's friend, Daron Gainey, describes Mr. Cooper as "a wonderful person, father, son, brother and provider." (Exhibit I).

Catherine Ash, China Martin's grandmother, describes the tremendous help Mr. Cooper has been since moving into the apartment she shares with her granddaughter and great-granddaughter: "He attends to the baby while my granddaughter is at work, assist me in preparing my meals and cleaning around the house and helps my granddaughter with her school work. He is really a great man and a wonderful father […]." (Exhibit J).

This is echoed by Ms. Martin: "When I am at work he feeds and bathes our daughter, plays and reads to her. When I come home he has meals on the table and has done all the house work. While I am at work I know that I do not have to worry about my daughter because she is being taken care of by her wonderful, caring father." (Exhibit H).

Clara McBride, Ms. Martin's godmother, similarly shares: "[Justin] is [a] wonderful man for my god daughter and an amazing father to the daughter they share. I see him regularly and am overcome with the patience he [has] with their daughter while he stays at home caring and teaching her while her mother is at work. I love how he and my god daughter are always pushing for each other to be great in life and strive to succeed." (Exhibit K).

And Mr. Cooper's mother and sister Katrina also describe the help he has provided to their family, by paying for his mother's rent and his sister's books and transportation, as well as by helping his autistic brother learn how to cook and groom himself. (See Exhibits G & L). Mr. Cooper is simply "a hard working person who would help anyone [] close to him if they needed […]." (Exhibit G).

### b.    *Nature & Circumstances of the Offense*

Mr. Cooper is the first to admit that his actions were wrong and illegal.  He has accepted full responsibility for his role in the sale of crack cocaine, and he has demonstrated appropriate remorse for his misconduct.

By way of explanation, and not excuse, Mr. Cooper sold user amounts of crack cocaine. He was not involved in supplying others. He did not profit in any meaningful way from the offense, and he demonstrated no signs of wealth.

This does nothing to justify Mr. Cooper's conduct, and he understands that he is solely to blame for his choices. He regrets the choices he has made and is intent on changing his life for the better.

No detail or opinion I offer the Court is meant to try to excuse the fact that Mr. Cooper committed a crime. Today, looking back, he acknowledges the gravity of his offense, and is thankful that he was stopped when he was. The reality is that this case has served as a positive

occurrence for Mr. Cooper who has come to understand the steps he needs to take to improve his life and contribute constructively to his family and community. He wishes only to continue seeking lawful employment and caring for his young daughter.

### III.  Remaining Factors of 18 U.S.C. § 3553(a)

a.      *The Need for the Sentence Imposed to Reflect the Seriousness*
        *of the Offense, to Provide Just Punishment, to Avoid Unwarranted*
        *Sentence Disparities, and to Promote Respect for the Law*

While there is no doubt that the crime for which Mr. Cooper stands convicted is serious, the imposition of lengthy prison sentences for non-violent drug offenses by street vendors like Mr. Cooper often defy a fair sense of retribution.

There is little evidence that incapacitating the members of the modest-sized drug organization described in the instant case will cause a net decrease in crime. The sentences in this case will not suppress the demand for crack, nor are they likely to work any meaningful effect on the price or supply of drugs sold by other organizations near the Mill Brook Houses. *See* Shawn D. Bushway & Peter Reuter, *Deterrence, Economics, and the Context of Drug Markets,* 10 Criminology & Pub. Pol'y 183, 190 (2011); *see also Bannister*, 786 F. Supp. 2d at 668–69.

Meanwhile, as the testimonials written to the Court demonstrate, Mr. Cooper sincerely regrets what he did, and these mistakes do not define who he is as at his core.

Therefore, I submit that a sentence of time served with three years' post-release supervision adequately reflects the seriousness of the offense and promotes respect for the law.

The requested sentence will also provide just punishment for the offense. In addition to the obvious consequences Mr. Cooper will face as a result of the requested sentence, he will also

face numerous collateral consequences, including: "ineligibility for federal welfare benefits, public housing, student loans, and employment opportunities, as well as various forms of civic exclusion, such as ineligibility for jury service and felon disenfranchisement." Michael Pinard, *Collateral Consequences of Criminal Convictions: Confronting Issues of Race and Dignity*, 85 N.Y.U. L. Rev. 457, 459 (2010). Further, beyond the direct and indirect consequences of imprisonment, Mr. Cooper must still face those problems that complicated his life before this case but that remain unresolved: poverty; dysfunctional family relationships; and limited education and vocational skills.

In an opinion by District Judge Frederick Block of the Eastern District of New York (15-CR-18, Doc. No. 43), he underscores that the effects of these collateral consequences can be devastating. As Professor Michelle Alexander has reminded us, "[m]yriad laws, rules, and regulations operate to discriminate against ex-offenders and effectively prevent their reintegration into the mainstream society and economy. These restrictions amount to a form of 'civi[l] death' and send the unequivocal message that 'they' are no longer part of 'us.'" Michelle Alexander, The New Jim Crow 142 (2010).

Lastly, the requested sentence would not result in a disparity.  An evaluation of the Sentencing Commission's sourcebook[1] is revealing in this regard. Of the 3,458 defendants sentenced in the Second Circuit in 2018, only 1,130 (32.7%) received a within-the-guidelines sentence, while 1,544 (44.7%) received a non-government sponsored below guidelines sentence. (*See* Exhibit M). Of the 1,438 defendants sentenced in the Southern District of New York, only 367 (25.5%) received a within-the-guidelines sentence, while 821 (57.1%) received sentences below the guidelines minimum sentence based solely on *Booker* and the factors of 18 U.S.C. §3553(a). (*See* Exhibit M).

---

[1] *See* United States Sentencing Commission Sourcebook of Federal Sentencing Statistics for Fiscal Year 2018.

Therefore, while every case presents different facts and circumstances, given the scope of Mr. Cooper's involvement in the conspiracy, his remorse and acceptance of responsibility, the requested sentence would not represent a disparity in sentencing.

The requested sentence would also be consistent with sentences imposed upon Mr. Cooper's co-defendants who have already been sentenced. *See* 18 U.S.C. § 3553(a)(6).  Notably, Mr. Cooper's participation in the conspiracy and criminal history is similar, if not less serious than that of co-defendant Jeffrey Goodridge, who received a sentence of time served with three years' post-release supervision, and is considerably less serious than that of co-defendant Chimba Carlos, who received a sentence of 366 days imprisonment.

Like Mr. Cooper, Jeffrey Goodridge joined the conspiracy in 2017. He, like Mr. Cooper, is being held responsible for distributing at least 11.2 grams but less than 16.8 grams of crack cocaine. In their sentencing submission for Mr. Goodridge, the government characterized both Mr. Cooper and Mr. Goodridge as falling into the least culpable category of defendants. (*See* Govt. Sentencing Submission, Doc. 306). According to the government, Mr. Goodridge sold crack cocaine to undercover officers on multiple occasions, and communicated by telephone with co-conspirator Patrick Innis regarding narcotics activity. (*See* Govt. Sentencing Submission, Doc. 306).

This alleged activity is very similar in character to that of Mr. Cooper's. According to the PSR, Mr. Cooper sold $100 worth of crack to a confidential informant in May 2017, and communicated by telephone with co-conspirator Patrick Innis regarding narcotics activity. It is also worth mentioning that Mr. Goodridge, Mr. Cooper's cousin, was present at the time he allegedly sold the crack cocaine to the confidential informant.

Additionally, as set forth in Mr. Cooper's PSR, his only prior criminal conviction, the 2011 misdemeanor assault, resulted from an incident where he was acting in concert with Mr. Goodridge. (*See* PSR, p. 18, ¶101).

For these reasons, I submit that Mr. Cooper and Mr. Goodridge are sufficiently similarly situated that it would be consistent for the Court to sentence Mr. Cooper similar to the sentence imposed upon Mr. Goodridge.

The requested sentence would also avoid a disparity with the sentence imposed upon co-defendant Chimba Carlos. On April 9, 2019, the Court sentenced Mr. Carlos to 366 days incarceration. Mr. Carlos, unlike Mr. Cooper, had a sentencing guidelines range of 37 to 46 months, and was characterized by the government as being more culpable than Mr. Cooper because he was involved in the cooking of crack cocaine as well as its distribution. Mr. Carlos was held responsible for at least 95 grams of crack cocaine and 90 grams of powder cocaine. Additionally, this was not Mr. Carlos' first narcotics-related conviction; in 2008 he was convicted of drug possession and sentenced to probation. He thereafter violated his probation and was re-sentenced to 60 days imprisonment.

We understand that comparing defendants like this is an imperfect exercise, and doesn't take into account the unique history and characteristics of each defendant. Nonetheless, we believe that these individuals' sentences provide important context as the Court contemplates a sufficient sentence for Mr. Cooper.

b.  *The Requested Sentence Can Provide Adequate Deterrence, and*
     *Protect the Public from Future Offenses by Mr. Cooper*

A non-incarceratory sentence can provide adequate general and specific deterrence.

There is no empirical data that proves that the imposition of a prison sentence accomplishes general deterrence.[2] Nonetheless, requiring Mr. Cooper to comply with the strict mandates of the Probation Office and all additional conditions imposed by the Court under U.S.S.G. §5B1.3 for many years sends a powerful message to the community.

Much of Mr. Cooper's life for years will be spent reporting to a probation officer, being subjected to strict supervision, and giving hours of his time in service to the community.

In addition, the requested sentence will provide specific deterrence and just punishment, as the threat of incarceration will remain present upon any violation of any condition. *See United States v. Gall*, 552 U.S. 38, 48-9 (2007) (describing probation as a punishment that "severely restricts an individual's liberty"); *quoting United States v. Knights*, 534 U.S. 112, 119 (2001) (explaining that "[probationers are] subject to several standard conditions that substantially restrict their liberty"); *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987) (underscoring that "[probationers] do not enjoy the absolute liberty to which every citizen is entitled").

Nonetheless, I believe that given the positive steps Mr. Cooper has already taken throughout the last 20 months on home confinement, and the other positive developments in his life, including the birth of his second child and the strong support from Ms. Martin's family, he presents no danger of reoffending.

Mr. Cooper has developed into a wonderful caregiver to his young daughter Z██ and he has obtained his OSHA certificate and has begun applying to jobs throughout New York City.

---

[2] Valerie Wright, Ph.D., "Deterrence in Criminal Justice," The Sentencing Project (November 2010)(http://www.sentencingproject.org/doc/deterrence%20briefing%20.pdf)("...the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"), quoting Andrew von Hirsch, Anthony Bottoms, Elizabeth Burney, and P-O. Wikstrom, "Criminal Deterrence and Sentence Severity: An Analysis of Recent Research," Oxford: Hart Publishing (1999).

He has become a strong source of support for Ms. Martin as she pursues her Master's degree in early childhood intervention, and he continues to help support his and Ms. Martin's families.

According to his mother-in-law Darlene Martin: "Justin possess the desire and determination to learn from this experience and any that may come his way. […] I have seen him blossom into this gentle, caring man." (Exhibit N).

His father-in-law, Harold Brown, Sr., is equally impressed: "Justin is a wonderful father and soon-to-be husband; he strives for everyone around him to succeed and encourages all to stand up for themselves. I am glad that my son has him as an older brother to look up to and [am] looking forward to him becoming a part of our family officially." (Exhibit O).

Therefore, as demonstrated by the letters of support and his actions over the past 20 months on home confinement, Mr. Cooper is well on his way to becoming a better man. He has already begun to take the steps necessary to implement important changes in his life, and is eager to utilize any further period of supervision as a chance to demonstrate that he can be a positive contributor to his family and community. Respectfully, the public does not need protection from Mr. Cooper beyond the suggested non-incarceratory sentence.

### IV. Conclusion

On behalf of Mr. Cooper and his family, I thank the Court for taking the time to consider our sentencing submission.  We look forward to addressing the Court on June 4, 2019.

Dated:        New York, New York
              May 13, 2019

                                        Respectfully submitted,


                                        /s/ *Edward V. Sapone*
                                        Edward V. Sapone
                                        Counsel for Defendant
                                        Justin Cooper

cc:          A.U.S.A. Alexandra Rothman
             A.U.S.A. Jordan Estes